Filed 5/2/16  P. v. Bernik CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C071777 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F01612) |
| v. | |
| ANDREY BERNIK, | |
| Defendant and Appellant. | |

Defendant Andrey Bernik contends his second degree murder conviction cannot stand because:  (1) his counsel rendered ineffective assistance by not moving to exclude a recording of an incriminating conversation; (2) the prosecution's delay in filing charges denied him his rights to a speedy trial and due process; (3) the trial court improperly denied his motion for new trial made on the grounds of newly discovered evidence and jury tampering; (4) the court erred in denying his pinpoint instruction on transferred intent; and (5) insufficient evidence supports the conviction.  We disagree with each of defendant's contentions and affirm the judgment.

1

FACTS

Stephan Bernik owned a landscaping business. He negotiated to sell the business to Valeriy Pishtoy and accepted a deposit from him. The two could not reach agreement, however, and Pishtoy asked for his deposit back. They both agreed to meet in a supermarket parking lot to discuss the issue.

At the appointed hour, each party arrived, accompanied by friends. Bernik arrived in a Mazda truck that was pulling a trailer. Yury Dovgan was with him. Alex Chekayda and Roman Mysin arrived in a Lexus. They came at Dovgan's request. Defendant, who is Stephan Bernik's son and Dovgan's friend, arrived in a Nissan Titan pickup truck along with his two brothers.

Dovgan had originally ridden with defendant in the Titan, but prior to arriving at the supermarket, the Mazda and the Titan stopped, and Dovgan got out. He walked over to the Mazda, walked back, and put a gun next to the seatbelt buckle in the Titan. He then returned to the Mazda and rode with Bernik to the supermarket.

Accompanying Pishtoy were Hariton Prutyanu, his son Aleksandr Prutyanu, and Yevgeniy Yakimov. Hariton arrived in his own car, and Yakimov and Aleksandr came in Aleksandr's car.

Pishtoy and Bernik started talking. Pishtoy heard Bernik say to another man, "Andrey, leave the gun." Someone from behind Pishtoy put a rope around his throat and started to hit him, while Bernik hit him from the front. A violent fight broke out, and Pishtoy was seriously injured. One of his sons took him away.

After the fight, the parties began fleeing the parking lot. Bernik drove out of the parking lot in his Mazda truck and trailer. As he did, Aleksandr's friend Yakimov jumped onto the trailer. The Nissan Titan rolled by Aleksandr, and as it did, someone from inside the truck pointed a gun at him. Then it left the lot.

2

Defendant's friend Dovgan jumped into the Lexus with Chekayda and Mysin, and they left to follow Bernik's Mazda and the Titan. Hariton and Aleksandr Prutyanu left in Hariton's car and they, too, tried to follow the Mazda.

As Bernik drove the Mazda, Yakimov moved from the trailer to the Mazda's bed. Bernik swerved the truck back and forth while Yakimov used a knife to break the rear window. With the truck moving, Bernik opened the driver's side door, jumped out, and ran away. Yakimov also jumped out of the truck, threw his knife in some bushes, and ran back to where his pickup was parked.

The driverless Mazda crashed into a fire hydrant. Two witnesses stopped at the accident scene and one pulled the keys out of the Mazda's ignition. The Lexus pulled up to the scene, and Dovgan exited the Lexus. Carrying a crow bar, he ran up to the Mazda, angry and yelling. One of the witnesses calmed him down. Meanwhile, the Titan pulled up across the street, and a gunshot from inside the Titan hit and killed Dovgan. The Titan immediately left the scene.

Later, the victim's father, Vasily Dovgan, recorded a conversation he had with defendant. In the conversation, defendant admitted he killed his friend, Vasily's son. The recording was played to the jury and a translated transcript was admitted into evidence by stipulation of the parties. In the conversation, defendant stated that at the time of the accident, he thought his father had been injured or killed while driving the Mazda and had fallen over out of sight. He claimed that when he arrived at the scene, there were men with daggers running around, so he started shooting. He did not aim at anyone but thought, "Whoever I hit, I hit." However, he stated that as the Titan pulled away, he thought he had "finished" the person he shot. He later learned he had killed "the wrong person."

Defendant testified at trial. He claimed that after the parking lot fight, he and his two brothers drove off in the Titan. Before leaving the lot, he noticed some men on the other side of the fight were armed with weapons; one had a knife. These men tried to

3

block the Titan, so he brandished his gun to scare them. He saw the man with the knife jump onto the Mazda's trailer and make his way to the truck's bed. The man started hitting the truck's window with the knife. The Mazda and the Titan took different routes out of the parking lot, but both ended up on the same street, with the Mazda behind the Titan. Defendant saw the Mazda swerving back and forth behind him, and his brother, who was driving the Titan, made a u-turn to go help their father. The Mazda almost hit them, and then it crashed. Defendant could not see his father, so he thought his father had been stabbed and was slumped over in his seat.

The Titan made another u-turn and headed back to the crash site. Defendant saw someone by the Mazda who he thought was the man who had been in the back of the Mazda attempting to break its window, along with some people he thought were the man's friends. He shot one time from the Titan to scare them away, and he saw someone fall. He asserted he just shot toward the Mazda and did not aim at anyone. After firing the shot, the Titan immediately sped off. Defendant also did not call the police. Defendant believed the person he shot was the person who had been in the back of the Mazda, whom he thought was Yakimov. He later learned he shot Dovgan.

A jury convicted defendant of second degree murder. (Pen. Code, §§ 187, subd. (a), 189.)[1] It also found that defendant intentionally and personally used a firearm to commit the crime, resulting in death. (§ 12022.53, subds. (b), (c), and (d).) The trial court sentenced defendant to a total prison term of 45 years to life; 20 years to life for the murder conviction, plus a consecutive 25 years to life for the firearm enhancement.

---

[1]     Undesignated references to sections are to the Penal Code.

DISCUSSION

I

*Ineffective Assistance for Not Attempting to Exclude the Recorded Conversation*

Defendant contends his trial counsel rendered ineffective assistance by not moving to exclude the recorded conversation between defendant and the victim's father, Vasily Dovgan, as an unlawful eavesdropping under section 632. We disagree, as such a motion was without merit. Section 633.5 provides an exception that would defeat a motion under section 632 in this instance.

A.    *Background*

Vasily met with defendant approximately five months after the shooting. He recorded their conversation using a recorder placed in his pocket. Before trial, defense counsel and the prosecution agreed not to call Vasily as a witness, and they stipulated instead to present the conversation's transcript and recording to the jury. Defendant claims his attorney violated constitutional standards of performance by not moving to exclude the evidence at trial.

B.    *Analysis*

To demonstrate ineffective assistance of counsel, a defendant must show both that counsel's performance was deficient and the deficient performance prejudiced the defense. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688 [80 L.Ed.2d 674, 693].) Because of the difficulties inherent in evaluating counsel's performance, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' [Citation.]" (*Id.* at p. 689.)

Counsel's performance here was not deficient. A motion to exclude the conversation as an unlawful eavesdropping under section 632 would fail due to the exception contained in section 633.5. Section 632 prohibits a person from intentionally

recording a confidential communication by an electronic recording device without the consent of all parties.  (§ 632, subd. (a).)  Generally, no evidence obtained from such eavesdropping is admissible at trial.  (§ 632, subd. (d).)

However, section 633.5 provides an exception to section 632's prohibitions.  According to section 633.5, "[n]othing in Section . . . 632 . . . prohibits one party to a confidential communication from recording the communication for the purpose of obtaining evidence reasonably believed to relate to the commission by another party to the communication of . . . any felony involving violence against the person . . . .  Nothing in Section . . . 632 . . . renders any evidence so obtained inadmissible in a prosecution for . . . any felony involving violence against the person . . . or any crime in connection therewith."  (§ 633.5.)

Section 633.5 exempts Vasily's recording of his conversation with defendant from section 632's prohibitions, and would defeat any objection to admitting the recording.  Vasily recorded the conversation to obtain evidence regarding defendant's "felony involving violence against the person."  His recording the conversation was not prohibited, and the transcript of the recording was admissible.  Thus, any attempt by defendant's counsel to exclude the evidence would have been denied.

Defendant claims section 633.5 does not apply here because, as he reads it, the statute applies only when the "felony involving violence against the person" is a felony committed against the person who is recording the conversation.  No felony was committed against Vasily, so, defendant contends, evidence of the conversation was not admissible.

Defendant's interpretation of section 633.5 is not consistent with the statute's language or the judicial precedent that interprets it.  The statute applies to a "party to a confidential communication," but its scope reaches to evidence of any felony involving violence against "the person."  The Legislature used the term "the person" to extend the statute's scope beyond the communicating parties.  A "person" is a "human being."

6

(Black's Law Dict. (10th ed. 2014) p. 1324, col. 1.)  Thus, for example, the phrases "crimes against the person" or "crimes against persons" refer to a "category of criminal offenses in which the perpetrator uses or threatens to use force" against a human being. (*Id*. at p. 454, col. 2.)  The Legislature's use of the term "the person" in section 633.5 confers the same effect on the statute.  It applies to evidence of "any felony involving violence against the person," or, in other words, violence against a human being.

Had the Legislature intended the statute to apply only to felonies committed against one of the parties to the communication, it would have limited its application to any felony involving violence against a "party to a confidential communication," the same term it used to designate the persons having the communication.  Instead, the Legislature used the phrase "violence against the person."  "It is a general rule of statutory construction that '[w]hen one part of a statute contains a term or provision, the omission of that term or provision from another part of the statute indicates the Legislature intended to convey a different meaning.'  [Citations.]" (*Klein v. United States* (2010) 50 Cal.4th 68, 80.)  The term "person" in section 633.5 means something different than "party to a confidential communication."

Only two reported cases apply section 633.5 in fact situations similar to this case, and both apply the meaning of section 633.5 we apply here.  *People v. Maury* (2003) 30 Cal.4th 342, concerned anonymous telephone calls made to, and recorded by, a public "hotline."  The defendant in a murder trial sought to suppress evidence of his recorded calls to the hotline.  As part of addressing that claim, the Supreme Court stated the taped communications were lawful under section 633.5 because they concerned three murders the police suspected defendant committed.  (*Id*. at p. 385.)  The recordings were lawful even though the violence was not committed against the person who recorded the calls.

*People v. Suite* (1980) 101 Cal.App.3d 680, involved recordings by state university police of telephone calls to their emergency telephone line in which the defendant stated bombs were in various campus buildings.  The defendant claimed the

7

recording of his calls violated section 632. The Court of Appeal disagreed, holding among other things that the calls were exempt from section 632 under section 633.5. It determined a bomb threat–in this case, threats involving buildings other than the one housing the police department–involved the potential for the type of violence against the person made admissible under section 633.5. (*Id*. at pp. 688-689.) Again, the recordings were lawful even though the threats were not made against the persons who recorded the calls.

The language of section 633.5 and the holdings of these cases indicate section 633.5 applies to recorded confidential communications containing evidence that connects a party to the communication to any felony involving violence against any person, not just to a felony involving violence against one of the parties to the confidential communication. In this case, section 633.5 would have defeated a motion by defense counsel to exclude evidence of defendant's recorded conversation. Accordingly, we conclude defense counsel did not render ineffective assistance by not moving to exclude the evidence.

II

*Due Process Right Against Precharging Delay*

Defendant contends he was denied his due process right against precharging delay because the prosecution delayed arraigning him for nearly three years after the homicide occurred. He claims he was prejudiced due to witnesses' memories fading and the prosecution's negligence. We conclude defendant forfeits this claim. He does so by raising an argument on appeal that was not raised at trial, and by failing to support his argument with any citations to the record. With no evidence before us, defendant fails to establish he was prejudiced.

A.    *Background*

The homicide occurred on April 12, 2006. Defendant was arrested on February 21, 2009, and arraigned on February 24, 2009. On October 26, 2011, and prior to trial,

8

defendant filed a motion to dismiss the action, claiming the action's filing nearly three years after the homicide denied him his due process rights. At trial, defendant claimed he had been prejudiced by the late filing because a recording of a witness's 911 call had been destroyed in the interim, and the witness's statement to police differed from her statement to the 911 operator. The prosecution claimed the delay was caused by its initially determining that section 632 barred admission of the taped conversation between defendant and Vasily. When the prosecution later determined its interpretation of section 632 was mistaken, it immediately filed charges.

The trial court denied the motion to dismiss. The prosecution's negligence did not prejudice defendant because there is no statute of limitations on murder, and he could still call the witness and the person who received the 911 call to testify.

On appeal, defendant argues the trial court erred in its ruling, although for a different reason. He argues the delay in filing the case was prejudicial because "the case is replete with witnesses, who because of the length of time, could not recall the specifics of the events." Defendant provides no citations to the record to support this claim.

Defendant also contends the delay was prejudicial because it was based solely on a change of legal opinion within the district attorney's office, not on a change of law or newly discovered evidence.

B.      *Analysis*

We conclude defendant has forfeited his due process claims. He forfeits them on two grounds. First, he raises an argument here he did not raise at trial. He contended at trial that he was prejudiced due to the destruction of a 911 recording. Before us, he omits that argument and claims he was prejudiced in part because witness memories had faded. A criminal defendant " 'cannot argue the court erred in failing to conduct an analysis it was not asked to conduct.' " (*People v. Tully* (2012) 54 Cal.4th 952, 980.)

Second, defendant forfeits his claim because he failed to provide any citations to the record to show the case "was replete with witnesses" who could not remember the

9

specifics of the event. Rule 8.928(a)(1)(B) of the California Rules of Court requires a party to support an argument with necessary citations to the record. Where a party does not comply with this rule, the party's argument is deemed forfeited. (*Nwosu v. Uba* (2004) 122 Cal.App.4th 1229, 1246.)

Moreover, by providing no reference to the record, defendant fails to show he was prejudiced by the prosecution's delay. "A defendant seeking relief for undue delay in filing charges must first demonstrate resulting prejudice, such as by showing the loss of a material witness or other missing evidence, or fading memory caused by the lapse of time. [Citation.]" (*People v. Abel* (2012) 53 Cal.4th 891, 908.) Because we do not assume prejudice (*People v. Nelson* (2008) 43 Cal.4th 1242, 1250), and defendant fails to establish any, our analysis of the due process claim ends here.

III

*Motion for New Trial*

Defendant contends the trial court erred by denying his motion for new trial. He sought a new trial based in part on newly discovered evidence, and on jury tampering resulting from public contacts with jurors. We conclude the trial court did not err. The purported newly discovered evidence could have been discovered with reasonable diligence before trial, and its admission would not likely have resulted in a different verdict. There also was no substantial likelihood the public contacts with jurors actually biased the jury against defendant.

A.    *Newly discovered evidence*

1.    *Background*

The evidence on which defendant based his new trial motion consisted of two items. The first was the testimony of Dr. Boris Zhalkovsky, defendant's psychiatrist. Dr. Zhalkovsky treated defendant from 2004 until April 2006, less than two weeks before defendant committed the crime, for anxiety and panic attacks. Defendant was convicted in November 2011. In an opinion rendered in June 2012, Dr. Zhalkovsky stated

10

defendant likely had a panic attack at the time of the shooting arising from his perceived inability to protect his father. In Dr. Zhalkovsky's opinion, defendant's behavior at the time of the crime and his immediately leaving the scene demonstrated the poor judgment that frequently accompanies patients with anxiety and panic attacks.

The second item of alleged new evidence consisted of a revised translation of the recorded telephone conversation between defendant and Vasily Dovgan. Defendant contended the translation stipulated to by the parties was incorrect in parts. Most particularly, the original translation recorded defendant telling Vasily that when he saw the crashed Mazda, he said, "That's it, dad's gone." The revised translation reads, "That's it. Dad is dead."

Defendant argued these items of evidence could have led the jury to a different verdict. Both explained why defendant fired the gun and why he left the scene immediately. On cross-examination, the prosecution asked defendant why, if he was protecting his father, did he leave the scene immediately and not return to check on his father. He did so, defendant argued on the new trial motion, because he had a panic attack and could not exercise sound judgment. Also on cross-examination, the prosecutor questioned defendant about the reasonableness of his use of force if he knew his father had left the scene and was "gone." Defendant argued on the motion that the revised translation contradicted the prosecution's theory.

The trial court denied the motion for new trial. It held that Dr. Zhalkovsky's opinion did not qualify as newly discovered evidence as it could have been discovered earlier with reasonable diligence. Defendant knew he had panic attacks and had received treatment for them since 2004. In addition, he testified at trial and could have then explained any symptoms he may have experienced at the time of the shooting. The revised transcript also did not qualify as newly discovered evidence, as defendant was asked at trial, and gave, his own explanation of what he said in the recorded conversation. He also had the original translation for two years prior to trial when he could have made a

11

revision. In addition, the court ruled Dr. Zhalkovsky's opinion and the revised transcript, had they been admitted, would not have changed the outcome of the case.

Relying on the arguments he raised before the trial court, defendant contends the court erred in denying his motion for new trial.

2.      *Analysis*

" ' "The determination of a motion for a new trial rests so completely within the court's discretion that its action will not be disturbed unless a manifest and unmistakable abuse of discretion clearly appears." ' [Citations.] ' "[I]n determining whether there has been a proper exercise of discretion on such motion, each case must be judged from its own factual background." ' [Citation.]

"In ruling on a motion for new trial based on newly discovered evidence, the trial court considers the following factors: ' "1. That the evidence, and not merely its materiality, be newly discovered; 2. That the evidence be not cumulative merely; 3. That it be such as to render a different result probable on a retrial of the cause; 4. That the party could not with reasonable diligence have discovered and produced it at the trial; and 5. That these facts be shown by the best evidence of which the case admits." ' [Citations.]" (*People v. Delgado* (1993) 5 Cal.4th 312, 328.)

The trial court here did not abuse its discretion in denying the motion for new trial sought on the basis of newly discovered evidence. Defendant could have discovered the evidence with any diligence prior to trial. Dr. Zhalkovsky's opinion did not qualify as newly discovered evidence, as defendant knew from two years prior to the murder that he suffered anxiety and panic attacks and was being treated for the condition by the doctor. If that was relevant to his defense, he could have informed his trial counsel or testified about it himself when he took the stand. He did neither. The revised transcript also did not qualify as newly discovered evidence, as defendant had the original transcript for two years prior to trial when he could have informed his counsel of a mistranslation. He also explained on the stand what he remembered he said in the conversation. In any event, the

purported mistranslation was trifling.  In the context of this case, defendant's statement of "[t]hat's it, dad's gone," is no different than, "[t]hat's it.  Dad is dead."

Moreover, admitting the purported new evidence on retrial was not likely to result in a different result.  Defendant admitted on the stand and in the conversation with Vasily that he killed the victim.  He admitted the person he thought he shot was Yakimov.  Although he now says he thought his father was dead or "gone," he claimed at trial that he was protecting his father.  Yet, he immediately left the scene without checking on his father, he did not call the police, and he failed to explain these actions.  This was sufficient evidence to support his second degree murder conviction with or without the new evidence.

B.    *Jury tampering*

    1.    *Background*

Defendant also sought a new trial based on jury tampering.  During jury deliberations, the jury informed the court that some "family members of the case" had had contact with some of the jurors.  The court then examined the affected jurors.

Juror No. 11, the jury foreperson, stated someone in the audience had asked him how much jurors receive in fees for jury duty.  Juror No. 11 stated he had waived the fees.  After the jury had finished deliberations for the day, the same person contacted three of the jurors, including Juror No. 11, as they left the courthouse.  He asked if they were through for the day.  None of the jurors responded.  Minutes later, as the trio walked to their parked cars, Juror No. 11 noticed four people who had been in the courtroom, including the one who had questioned the group moments earlier, standing around a vehicle and watching the jurors get into their cars.  The four people did not say anything to the jurors.

As Juror No. 11 drove away, he noticed one of the four people, a female, was following him in her car.  They both continued onto the freeway.  Juror No. 11 was not certain she was following him, but he performed a couple of maneuvers in traffic and

13

outmaneuvered the vehicle. He did not feel afraid from these contacts, and none of the other jurors expressed fear when they heard about them.

Juror No. 10 had seen the same man Juror No. 11 described asking the jurors as they left the courthouse if they were done for the day. The juror also saw him walk through the juror parking lot. Juror No. 10 had seen a group of people outside the courthouse as the juror left for the parking lot but was not sure they were watching the juror. The juror thought some of the female jurors were concerned and uncomfortable about these contacts, but they were not afraid.

Juror No. 6 reported seeing some of the people in the courtroom audience at a restaurant during lunch. One of them was the same man described by Juror Nos. 11 and 10. Juror No. 6 overheard a female in the group say "it's murder," and "left his father." No one in the group addressed or contacted the juror.

Juror No. 5 was with Juror No. 11 when, leaving the courthouse, a man asked them if they were done for the day. The juror replied they were. Juror No. 5 also saw the group of people from the courtroom audience watch as the jurors went to their parked cars. The man who had inquired of them earlier was one of those who watched.

Juror No. 2 had also seen the group of people watching the jurors as they went to the jury parking lot. Not wanting them to see her get into her car, Juror No. 2 held up and pretended to use her phone. Juror No. 2 then saw a female and a male from the group walk through the juror parking lot. The juror saw the male get into a car parked on the street that borders the lot. Seeing this and hearing the other jurors talk about their experiences made Juror No. 2 wonder if she should be worried.

Juror No. 12 stated he had sat down in the hallway next to a female. The juror did not recognize her. The juror said good morning, the female said good morning, and she commented on the weather. They exchanged a few words, and then the juror recognized the female as someone he had seen in the courtroom. The juror got up and moved.

14

Juror Nos. 2, 5, 6, 10, 11, and 12 all stated these contacts would not affect their ability to be fair and impartial to both the prosecution and the defense, and they could set the contacts aside. The court inquired of the entire panel, and all of the jurors indicated they could be fair and impartial for both sides.

Defense counsel moved for a mistrial. The court denied the motion, concluding the contacts were not inappropriate and all of the jurors stated they could be fair and impartial. The court believed some in the courtroom audience were attempting to influence the jurors, but there was no evidence what had occurred prejudiced defendant, and there was no evidence the jurors had done anything improper.

When defendant filed his motion for new trial, he asserted jury tampering based on these facts as a ground for granting the motion. The trial court denied the motion brought on this basis, noting each juror, without equivocation, had stated he or she could be fair and impartial to both sides.

Defendant contends the court erred, as there was evidence of jury intimidation.

2.      *Analysis*

"An accused has a constitutional right to a trial by an impartial jury. [Citations.] An impartial jury is one in which no member has been improperly influenced [citations] and every member is ' "capable and willing to decide the case solely on the evidence before it" ' [Citations.]" (*In re Hamilton* (1999) 20 Cal.4th 273, 293-294.)

"A juror's . . . involuntary exposure to certain events or materials other than what is presented at trial generally raises a rebuttable presumption that the defendant was prejudiced and may establish juror bias. [Citation.] As relevant here, . . . [a] nonjuror's unauthorized communication with a juror during trial that concerns the matter pending before the jury likewise raises a presumption of prejudice. [Citations.]" (*People v. Merriman* (2014) 60 Cal.4th 1, 95.) Other events outside the courtroom that may require examination for probable prejudice may "include attempts by nonjurors to tamper with the jury, as by bribery or intimidation." (*In re Hamilton, supra,* 20 Cal.4th at p. 295.)

15

"[T]he presumption of prejudice is rebutted, and the verdict will not be disturbed, if a reviewing court concludes after considering the entire record, including the nature of the misconduct and its surrounding circumstances, that there is no substantial likelihood that the juror in question was actually biased against the defendant. [Citations.] Our inquiry in this regard is a 'mixed question of law and fact' subject to independent appellate review. [Citation.] But ' "[w]e accept the trial court's credibility determinations and findings on questions of historical fact if supported by substantial evidence." [Citations.]' [Citation.]" (*People v. Merriman, supra,* 60 Cal.4th at pp. 95-96.)

After reviewing the record and the nature of the misconduct, we conclude there is no substantial likelihood the jury was actually biased against defendant due to the public contacts. Nothing in the record indicates the jurors understood which party the people who spoke with them and watched them were supporting. The incidents of direct comments to the jurors did not concern any substantive issue or evidence from the trial. Juror No. 6 overheard comments about the case, but there was no indication the comments were directed towards the juror or that the juror knew which party the people supported. Some of the jurors were concerned about being watched by people, but none of them expressed feeling fear or intimidation.

In addition, under the trial court's questioning, each juror stated he or she had not been affected by the contacts and could be fair and impartial to both sides. The court was entitled to rely upon those statements "to determine whether a juror can maintain his or her impartiality after an incident raising a suspicion of prejudice." (*People v. Harris* (2008) 43 Cal.4th 1269, 1304.) We defer to the trial court's credibility determinations when supported by substantial evidence, and the jurors' statements are substantial. (*Id.* at p. 1305.)

16

Under the totality of the circumstances, there is no substantial likelihood the jurors were actually biased against defendant due to the public contacts. The trial court did not err in denying the motion for new trial on this basis.

IV

*Pinpoint Instruction on Transferred Intent*

Under the common law doctrine of transferred intent, "one's criminal intent follows the corresponding criminal act to its unintended consequences. . . . [T]he reasoning applies equally to carry the lack of criminal intent to the unintended consequences and thus preclude criminal responsibility." (*People v. Matthews* (1979) 91 Cal.App.3d 1018, 1023 (*Matthews*), italics omitted.) Accordingly, "the doctrine of self-defense is available to insulate one from criminal responsibility where his act, justifiably in self-defense, inadvertently results in the injury of an innocent bystander." (*Id*. at p. 1024.)

Defendant argued he was not guilty of any crime due to lawful self-defense, and, alternatively, he was not guilty of murder because he did not intend to kill. He requested a pinpoint instruction on transferred intent. Relying on *Matthews*, he sought to add the following language to CALCRIM No. 562: "any defenses that applied to any intended killing applied to the unintended killing as well." The trial court denied the request, holding that CALCRIM No. 562 adequately explained the law. The court instructed the jury with CALCRIM No. 562 as follows: "If the defendant intended to kill one person, but by mistake or accident killed someone else instead, then the crime, if any, is the same as if the intended person had been killed."

Defendant contends the trial court erred by refusing to give his pinpoint instruction modifying CALCRIM No. 562. He asserts the instruction would have been beneficial in jury deliberations, as defendant testified he just wanted to scare people away from his father.

17

The trial court did not err. A court may refuse a proposed instruction when another instruction covers the same point. (*People v. Clark* (2011) 52 Cal.4th 856, 975.) Other instructions the court gave to the jury here fully explained the point defendant wanted addressed. The court instructed the jury with a pinpoint instruction also offered by defendant, instruction No. 505a, that specifically addressed defendant's theory. The instruction read: "If the defendant acted in justifiable defense of another, but he mistakenly injured or killed a bystander, he did not commit any crime against that person. In other words, the defendant is not guilty if he justifiably attempted to defend another person, but by mistake he injured or killed a bystander. The prosecution has the burden of proving beyond a reasonable doubt that the defendant did not act in justifiable defense of another person."

Moreover, the court gave instruction No. 505a in the context of other instructions that addressed defendant's defenses to the shooting. The court instructed as follows: "If a person kills with a legally valid excuse or justification, the killing is lawful and he has not committed a crime;" and "[t]he defendant is not guilty of murder or manslaughter if he was justified in killing someone in defense of another." The court went on fully to instruct on the defense of self-defense.

The court also gave instructions that addressed the defense of lack of intent to kill. The court instructed on killing in the heat of passion and imperfect self-defense, both of which theories would have reduced defendant's crime to voluntary manslaughter due to a lack of intent. In addition, the court stated: "In order to prove murder or voluntary manslaughter, the People have the burden of proving beyond a reasonable doubt that the defendant acted with intent to kill or with conscious disregard for human life. If the People have not met either of these burdens, you must find the defendant not guilty of murder and not guilty of voluntary manslaughter."

The court also instructed on involuntary manslaughter, where a person kills without the intent to kill and without conscious disregard for human life. It stated:

18

"Involuntary manslaughter is a lesser offense to murder . . . . When a person commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life, then the crime is involuntary manslaughter." The court fully explained the elements of involuntary manslaughter.

Taken together, the court's instructions addressed defendant's theory based on transferred intent–that he acted in self-defense and did not intend to kill. Because the theory was so fully covered, the court did not err when it refused to give defendant's duplicative pinpoint instruction.

V

*Sufficiency of the Evidence*

Defendant contends insufficient evidence supports his conviction of second degree murder because he acted only to protect his father from what he thought was an attack by a man with a knife. We disagree, as ample evidence supports the conviction.

To convict defendant of murder, the jury had to conclude defendant (1) committed an act that caused the victim's death, (2) acted with malice, and (3) killed without lawful excuse or justification. (§§ 187, 189.) Malice is either express or implied. Defendant acted with express malice if he manifested "a deliberate intention unlawfully to take away the life of a fellow creature." (§ 188.) He acted with implied malice if the killing resulted from " 'an intentional act, the natural consequences of which are dangerous to life, which act was deliberately performed by [defendant] who knows that his conduct endangers the life of another and who acts with conscious disregard for life.' " (*People v. Blakeley* (2000) 23 Cal.4th 82, 87.)

Substantial evidence supports the first two elements of murder. Defendant's act of shooting caused the victim's death, and defendant acted with either express or implied malice. Defendant's later admission that he had killed "the wrong person" implies he intended to kill someone. Moreover, he intentionally and deliberately fired his gun into the crowd of people gathered by the Mazda, knowing his act would endanger their lives

19

but consciously disregarding that fact. Defendant's explanation of his thought process at the time of the shooting perfectly describes implied malice: "Whoever I hit, I hit."

Sufficient evidence also supports the third element of murder; the jury's determination that defendant killed without justification. For a killing in defense of another to be justified, the defendant must actually and reasonably fear that the person is in imminent danger of great bodily injury or death. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1082.)

Substantial evidence at trial indicated defendant did not actually believe his father was in imminent danger. Defendant shot only one shot from the truck, and then he and his brother immediately left the scene without checking on their father or seeing if the shot had scared people away. Defendant testified he believed all of the people surrounding the Mazda were hostile to his father, yet after firing the shot, he left the scene while purportedly thinking his father was still surrounded by people defendant believed were hostile. Defendant also did not seek police assistance or medical aid for his father. He returned to the scene some hours later after he learned he had shot his friend. Police were there, but he did not speak with them. He called his attorney.

This evidence was sufficient for the jury to conclude defendant did not actually fear that his father was in imminent danger of harm. Because there was no actual fear, the killing was not justified, and all of the elements of second degree murder were met.

DISPOSITION

The judgment is affirmed.

_____NICHOLSON_____, J.

We concur:

_____RAYE_____, P. J.

_____HOCH_____, J.

20